IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Kewon English and Earl Powell,<br><br>Plaintiff,<br><br>vs.<br><br>Joseph Clarke, Leon Lott, in his official capacity as Sheriff of Richland County, and Richland County Sheriff's Department.<br><br>Defendants. | CASE NO.: 3:19-2491-JMC-PJG<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

The Plaintiffs, above-named, complaining of the Defendants, above-named, allege and say as follows:

1.  Plaintiff Kewon English is a citizen and resident of the State of North Carolina, but at the time of the incidents described herein, was a citizen and resident of the State of South Carolina.

2.  Plaintiff Earl Powell is a citizen and resident of the State of South Carolina.

3.  Defendant Joseph Clarke is a citizen and resident of Richland County, South Carolina, and at all relevant times, has been an employee of the Richland County Sheriff's Department ("RCSD"). Clarke is sued in his individual and official capacities.

4.  Defendant Leon Lott, in his Official Capacity as Sheriff of Richland County ("Lott") and Defendant RCSD are citizens and residents of Richland County, South Carolina.

5.  If there is a judgment in this case, it will not be satisfied by the State of South Carolina, as Lott and RCSD are one of the few self-insured Sheriffs/sheriff's departments in the state of South Carolina. Lott and RCSD exercise a significant degree of autonomy from the State

1

of South Carolina. Lott and RCSD is involved with local concerns as opposed to statewide concerns. Finally, Lott and RCSD are treated as local officials under state law. For these reasons and others, while South Carolina courts have held that other sheriffs in South Carolina are state officials, and thus entitled to 11th amendment immunity from official capacity claims, Lott and RCSD are subject to *Monell* and individual capacity claims in light of the above and other differences between Lott and RCSD and other sheriffs and sheriff's departments that have been held to possess said immunity.

6. As set forth more fully below, the incidents out of which this action arise occurred in Richland County, South Carolina.

7. Venue is proper in this Court, and this Court has both subject matter and personal jurisdiction over all claims and parties.

## FACTUAL BACKGROUND

8. The Plaintiffs were charged with serious crimes, prosecuted for those crimes, and incarcerated for over a year, based on false confessions that Clarke new to be false. Clarke obtained the false confessions and operated in other various unconstitutional ways as described herein, pursuant to Lott and RCSD's training and supervision, as well as their officially adopted or well-promulgated policy, well-established custom and practice, and pursuant to the actions and decisions of final policymakers.

9. On or about August 4, 2015, an individual reported to the RCSD that she had been the victim of a sex crime. She reported that she awoke to two men in her apartment around midnight, and that it was dark, and she did not see either of the two men. While she originally denied to the 911 operator that she had any idea who the attackers were, after spending some time with RCSD employees, she stated that she heard one of the alleged attackers refer to the other

attacker as "Kewon," and told investigators that the attackers said they were just trying to get money "for their kids." The alleged victim also indicated that she believed the second attacker to be "Shakim." Upon information and belief, the victim's statement that the victim identified "Shakim" as the second attacker was never disclosed to the Plaintiffs or their counsel during the criminal proceeding. The Plaintiffs did not have kids. Pursuant to RCSD policy at the time, the interactions between law enforcement and the victims were not recorded audially or visually, and any written statements provided by the witnesses or victim were written up by the RCSD employees for the victim or witness to sign.

10. Based only on the fact that the victim believed she heard one of the attackers refer to the other attacker as "Kewon," and that English was a young African American male like the alleged attacker, Clarke determined that English was the prime suspect in the alleged attack. The physical descriptions of the attackers varied greatly in numerous substantial ways each time the alleged victim described the attackers, but the physical descriptions used by investigators differed significantly from the physical description of English. The victim never provided any information that would implicate Powell as one of the attackers.

11. English, a minor child at the time, was subsequently questioned on August 5, 2015. English suffered from various mental and psychological issues at the time and was not well-educated. English did not have a parent or an attorney with him during the lengthy interrogation, and the interrogation was not recorded audially or visually. In fact, English asked for an attorney and to have his mother present during the interrogation and Clarke denied those requests. Despite the lengthy custodial interrogation under conditions uncomfortable for English, English consistently denied any wrongdoing or relevant knowledge. After hours of this, Clarke prepared an entirely inaccurate written statement and told English that if he signed the statement he could

go home. English signed the statement without reading it, and Clarke immediately arrested English.

12.     Based entirely on the false confessions which Clarke knew to be false, English was arrested and charged with criminal sexual conduct (first degree) and burglary (1st degree) and was denied bond. A warrant was obtained based on the false signed statement that Clarke knew to be false.

13.     Because the written statement signed by English implicated Powell, Clarke began the process of trying to take Powell into custody. At the time, Powell was working with his relative helping someone move. After a long day of helping the relative move, Powell returned home to find law enforcement present. Powell was physically and mentally exhausted from the workday, and it was almost midnight when Clarke took him into custody and began interrogation. Clarke then subjected Powell to the same interrogation techniques used with English. Powell did not have an attorney with him during the lengthy interrogation, and the interrogation was not recorded audially or visually. Powell asked for an attorney one or more times during the interrogation and Clarke denied those requests. Despite the lengthy interrogation under conditions uncomfortable for Powell, Powell consistently denied any wrongdoing or relevant knowledge. After hours of this, Clarke prepared an entirely inaccurate written statement and told Powell that if he signed the statement he could go home. Powell was told that if he didn't sign the statement, he would never see his grandmother again, which was particularly upsetting to Powell since his grandmother relied on him heavily for various forms of assistance and he was extremely close with his grandmother. Powell signed the statement without reading it, and Clarke immediately transported Powell to the detention center and obtained a warrant based on the written statement signed by Powell which Clarke knew to be false.

14. The Defendants obtained DNA samples and fingerprints from Powell and English to compare to the DNA and fingerprint evidence obtained from the scene.

15. Attorneys from the public defender's office were later assigned to the case and almost immediately began asking for the DNA testing results, discovery, and *Brady* materials.

16. On or about November 10, 2015, the Plaintiffs were indicted based on the inaccurate and false information regarding the alleged confessions. There was no physical evidence linking the Plaintiffs to the alleged crime.

17. In approximately March of 2016, the DNA results came back, showing that the DNA obtained from the victim did not match either Plaintiff's DNA. Fingerprint evidence from the scene did not match the Plaintiffs' fingerprints either. DNA results actually matched a third person who had never been mentioned by the victim or anyone else, and whose involved was completely inconsistent with the case against the Plaintiff. This DNA match was not disclosed the Plaintiffs' defense attorneys. Clarke obtained an arrest warrant for the individual whose DNA matched, which meant that, at that point, charges were pending against English, Powell, and the third person (not named Shakim), simultaneously for a crime that the victim consistently said was committed by two attackers – one male named Shakim and one male named Kewon. Clarke's alleged case against English and Powell was based largely on the two men being together at the time of the crime. For these reasons and others, the DNA evidence completely obliterated Clarke's story of what happened, completely exonerated the Plaintiffs, and highlighted the falsity of the confessions allegedly obtained by Clarke.

18. On or about May 10, 2016, Clarke admitted to English's criminal defense attorney that the DNA and fingerprint evidence showed that the Plaintiffs were not guilty of the crime, eliminating any probable cause for the Plaintiffs' continued arrest, prosecution, or otherwise

5

continuation of legal process against the Plaintiffs. Clarke further admitted that it was likely that other individuals committed the alleged crime. Upon information and belief, Clarke's belief was never communicated to prosecutors, and Clarke never took any steps to have the charges dismissed despite this admission to the criminal defense attorney. Clarke has denied under oath that this conversation with the criminal defense attorney ever took place. Clarke has testified that, to this day, he still believes there is probable cause to try the Plaintiff for the alleged crime based on the false confessions that Clarke knew to be false. Upon information and belief, the charges continued past the receipt of the DNA results based entirely on the false confessions which Clarke knew to be false, coupled with the deliberate failure to properly investigate and disclose exculpatory evidence.

19. The Plaintiffs' criminal defense attorneys were aware of the absence of any physical evidence linking the Plaintiffs to the crime and consistently begged for the charges against the Plaintiffs to be dismissed. Upon information and belief, Clarke withheld other extremely important exculpatory evidence, including the victim's identification of someone named Shakim as the second attacker, and the fact that the DNA matched a third person other than English and Powell.

20. In December of 2016, the prosecutor finally agreed to dismiss the charges. They were dismissed the following morning, and the Plaintiffs were released from jail. The prosecution against the Plaintiffs continued to that point based largely on the false confessions which Clarke knew to be false, as well as Clarke's withholding of and failure to properly investigate exculpatory evidence.

21. Plaintiffs have incurred substantial damages, as a direct and proximate result of Defendants' acts and omissions. Plaintiffs have endured loss of freedom, unlawful arrest and

incarceration, fright, anxiety, embarrassment, humiliation, mental anguish, emotional distress and depression, as well as personal and professional reputational damage.  Plaintiffs were unable to maintain gainful employment, attend school, or otherwise enjoy over a year of their youth due to Defendants' illegal arrest and detention of him based on false confessions, failure to dismiss the charges in a timely manner once it was undisputed that the Plaintiff had not committed any crime, and failure to disclose important exculpatory evidence, among other wrongs.

22.     At all relevant times, the Defendants were acting under the color of state law.

23.     Throughout the time period described above, it was the clear and established policy and practice of the Defendants to conduct interviews of suspects without recording the interview audially or visually, and for the officer to prepare the written statement for the suspect to sign.  As a result, due to this established policy and practice, there was no record of the interrogation of the Plaintiffs or alleged confessions other than the records created by Clarke.  Further, prior to and after the events in question, Clarke had a well-documented and profound history of misconduct. The policy and practice of Lott and RCSD was such that serious incidents of misconduct were overlooked, non-document, and directly or indirectly encouraged.  The Defendants maintain a culture of hiding documents and information as part of all phases of the civil and criminal litigation process.  The Defendants also maintain a well-established culture of failing to adequately train and supervise employees.  Finally, the actions at issue in this case were carried out by the final policymaker(s) for Lott and RCSD.  All of this was a driving force behind the violations of the Plaintiffs' constitutional rights.

## FOR A FIRST CAUSE OF ACTION
### (42 U.S.C. Section 1983 Against all Defendants)

24.     Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

25. At all times mentioned herein, the Defendants acted under the color of state law and in the course and scope of their official government duties.

26. The Defendants violated the Plaintiffs' rights afforded to them under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States constitution as described above, and as summarized below:

   a. By violating the Plaintiffs' first amendment right to be free from state-compelled speech;

   b. By subjecting the Plaintiffs to an unconstitutional interrogation;

   c. By knowingly obtaining false confessions from the Plaintiffs;

   d. By obtaining a warrant for the Plaintiffs' arrest based on information which was known to be false;

   e. By arresting the Plaintiffs in the absence of probable cause;

   f. By failing to investigate, obtain, and/or follow up on exculpatory evidence;

   g. By denying the Plaintiffs right to counsel;

   h. By failing to disclose exculpatory evidence in their possession;

   i. By intentionally or recklessly concealing exculpatory evidence in their possession;

   j. By causing the Plaintiffs to be detained unlawfully;

   k. By initiating prosecution against the Plaintiff in the absence of probable cause;

   l. By continuing prosecution against the Plaintiff in the absence of probable cause;

   m. By giving perjurious testimony at pre-trial hearings regarding the circumstances in which the Plaintiffs allegedly gave incriminating statements during their interrogations;

n. By engaging in conduct that shocks the conscience;

o. By violating the Plaintiffs' right to be free from state-created or state-enhanced danger;

p. By subjecting the Plaintiffs to differing and unique treatment as compared to others similarly situated without any rational basis for doing so, and for arbitrary, vindictive, or malicious reasons;

q. Defaming the Plaintiff, which caused an accompanying loss of liberty or property;

r. By providing information to obtain an indictment which was known to be false; and

s. By otherwise initiating, continuing, and failing to take steps within their power to cease, illegal criminal process against and detention of the Plaintiffs.

27. The constitutional rights violated by the Defendants were clearly established at the time that the Defendants violated them.

28. In carrying out the above conduct, Defendants were acting pursuant to customs, usages, practices, procedures, policies, and rules of Defendants Lott and RCSD.  At all relevant times, Clarke was acting pursuant to the well-established policy, custom, and culture established by Lott and RCSD, as well as the training (or lack thereof) and supervision of Lott and RCSD.  There was also a well-documented history of failing to properly discipline Clarke and those like him for significant misconduct.  Further, one or more acts or omissions described herein were carried out by or at the direction of final policymakers.  All of this was a driving force behind the violations of the Plaintiffs' constitutional rights.  Many of the facts and documents underlying this claim for municipal liability are subject to a confidentiality order in the pending state claims, so

they are omitted from this pleading out of an abundance of caution. However, those relevant facts, including those contained in the transcript of the deposition of Clarke, and the documents and discovery responses produced by the Defendant, are incorporated by reference.

29. As a direct and proximate result of the Defendants' deliberate, reckless, deliberately indifferent, malicious, and/or bad faith acts and omissions, the Plaintiffs were, among other things: deprived of their liberty without Due Process of Law; wrongfully arrested and prosecuted; wrongfully detained; and remained incarcerated for over a year, as well as all of the physical, emotional, and pecuniary injuries proximately caused by the same.

30. As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial. The Plaintiffs seek all available remedies under the law, including all available actual and punitive damages, as well as reimbursement of attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment against the Defendants for all damages available to the Plaintiffs, including all available actual and punitive damages, in an amount to be determined by a jury, as well as attorneys' fees and expenses, for interest, for all other available damages under applicable law, and for such other relief as the Court deems just and proper.

(*signature block on following page*)

WHITE, DAVIS, AND WHITE LAW FIRM

/s/ Kyle J. White
Kyle White (S.C. Bar No. 101426)
209 East Calhoun Street
Post Office Box 1346
Anderson, SC 29621
Telephone: (864) 231-8090
Facsimile: (864) 231-8006
kyle@wdwlawfirm.com

Anderson, South Carolina
September 3, 2019

Attorneys for the Plaintiffs